## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| TIMOTHY GALARNYK, | Civil No. 08-3351 (JRT/AJB) |
| Plaintiff, | |
| v. | |
| TOM FRASER, MIKE MARTIN, UNKNOWN SUPERVISOR OF TOM FRASER, UNKNOWN MINNEAPOLIS POLICE OFFICERS, UNKNOWN MINNESOTA STATE PATROL/TROOPERS, and CITY OF MINNEAPOLIS, | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| Defendants. | |

Paul Applebaum, **APPLEBAUM LAW OFFICE**, 332 Minnesota Street, Suite W1610, St. Paul, MN 55101; Charles L. Hawkins, **LAW OFFICES OF CHARLES L. HAWKINS**, 150 South Fifth Street, Suite 3260, Minneapolis, MN 55402; Elliot Richardson, **RICHARDSON LAW OFFICE**, 20 South Clark Street, Suite 500, Chicago, IL 60603, for plaintiff.

Marsha Eldot Devine, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101-2128 for defendants Tom Fraser, Unknown Supervisor of Tom Fraser, and Unknown Minnesota State Patrol/Troopers.

Darla J. Boggs and James Anthony Moore, Assistant City Attorneys, **MINNEAPOLIS CITY ATTORNEY'S OFFICE**, 350 South Fifth Street, Room 210, Minneapolis, MN 55415, for defendants Mike Martin, Unknown Minneapolis Police Officers, and City of Minneapolis.


This case stems from the tragic collapse of the I-35W bridge in Minneapolis on

August 1, 2007. A local bridge expert, plaintiff Timothy Galarnyk, gave television

interviews about his theories regarding causation.  When he later entered the collapse site command area without proper credentials and caused a disturbance, he was arrested. Galarnyk brought claims of false arrest and First Amendment retaliation, among others. Before the Court are motions for summary judgment by all defendants.  Because the Court finds the defendants are entitled to benefit from both qualified and official immunity for claims arising from Galarnyk's arrest, the Court grants the motions.

## BACKGROUND

Galarnyk is a bridge and construction safety expert with twenty-nine years of experience in the field.  (Affidavit of Timothy G. Galarnyk, Jan. 19, 2011 (hereinafter "Galarnyk Aff."), Ex. 2 ¶ 2, Docket No. 101.)  On August 1, 2007, when the I-35W bridge collapsed in Minneapolis, Galarnyk was contacted by several news stations to offer on-air opinions about the cause of the collapse, which he did the following day. (Dep. of Timothy G. Galarnyk, (hereinafter "Galarnyk Dep."), Ex. 1 at 40–41, Docket No. 101.)

On August 2, 2007, Galarnyk went to the collapse site, wearing a reflective vest bearing the name of his company, Construction Risk Management.  (Galarnyk Aff. ¶ 6.) The collapse site command area on that date was not secured with fencing so he was able to drive into the area, located by the Red Cross building.  (*Id.* ¶ 5.) He met defendant Timothy Fraser, a Captain with the Minnesota State Patrol, explained his expertise, and gave him his card.  (Galarnyk Dep. at 46.)  At or around the same time, Galarnyk obtained copies of the inspection reports regarding the bridge from the Minnesota

Department of Transportation ("Mn/DOT") and began appearing as a guest on numerous talk shows expressing critical views of Mn/DOT and the handling of bridge inspections prior to the collapse. (Galarnyk Dep. at 54–55.)[1]

Galarnyk returned to the collapse site on Thursday, August 9. He claims he contacted the National Transportation Safety Board ("NTSB") to discuss his concerns and was told to meet Dan Walsh at 10:00 A.M. (*Id.* at 56.) Walsh is a senior investigator for the NTSB. (Aff. of Dan Walsh ¶ 1, Feb. 1, 2011, Docket No. 105.) Galarnyk does not recall with whom he spoke to arrange this meeting. (Galarnyk Dep. at 56.) He drove to the collapse site command area, now secured with fencing and security stations, and said he had a meeting with Walsh. (*Id.*) The officers staffing the entrance directed him to the NTSB trailer. (*Id.* at 61–64.) After locating the NTSB trailer, Galarnyk claims to have met with Walsh in the presence of two other individuals, whom he does not identify. (*Id.*) On his way into the trailer, he claims Fraser saw him and questioned why he was there. (*Id.*) He claims that he met with Walsh who then gave him a handwritten piece of paper with his contact information asking Galarnyk to get back into contact with him about some information. (*Id.*) Galarnyk has not identified that paper as a part of the record.

Walsh knew which contractors were authorized to assist the NTSB in its investigation. (Walsh Aff. ¶ 5, Docket No. 105.) He states that Galarnyk was not one of

---

[1] Galarnyk recalls appearing on the following programs: FOX news television, August 2 (morning and evening appearances); CBS radio program, August 2; Geraldo Rivera Show, August 5; CNN and FOX News, August, 6; Al Jazeera Network, date unknown. (Galarnyk Dep. at 45, 54–55.)

those authorized contractors and that he has no recollection of meeting with Galarnyk on August 9.  (*Id.* ¶ 6–7.)  He states that "it would be highly unlikely for me to meet with individuals within the secure area who were not authorized to assist the NTSB."  (*Id.* ¶ 7.)

On his way out of the NTSB trailer, Galarnyk passed the Occupational Safety and Health Association ("OSHA") trailer and witnessed a meeting in progress.  (Galarnyk Dep. at 72.)  He admits to entering the trailer and interjecting himself into an ongoing meeting without invitation.  (*Id.*)  He also admits to challenging the individuals in the meeting and being told to leave by Mark Hysell, OSHA Director for the Northwest area of Wisconsin.  (*Id.* at 75.)  Hysell states that Galarnyk was being disruptive, raising his voice, and that he was not authorized to be in the secured area.  (Aff. of Mark Hysell ¶ 10, Dec. 8, 2010, Docket No. 96.)  According to Hysell, a Mn/DOT employee went to the State Patrol command office and asked for assistance with Galarnyk.  (*Id.* at 12.)

Galarnyk left the OSHA trailer and got into his truck.  (Galarnyk Dep. at 76.)  Fraser and another State Patrol officer knocked on his window and told Galarnyk to get out of the car.  (*Id.* at 78.)  Galarnyk complied and was taken to the Minneapolis Police Department ("MPD") command post and then into custody.  (*Id.* at 79–83.)  Galarnyk does not know the officer who actually arrested him.  (*Id.* at 83.)  He alleges that Fraser stopped him illegally and "caused" his arrest.  (*See* Compl. ¶ 65, Docket No. 13.)

In the course of his arrest, Galarnyk claims that Fraser made the following statements to the MPD officers handling his arrest: "Do you know who that guy is?  He was on Geraldo.  We've got to keep him locked up in a deep dark room so he doesn't get any more information as long as we can" and "[m]ake sure you keep him locked up as

long as you can." (*Id.* at 78, 81.)   As he was being taken to the MPD trailer, Galarnyk called his contact at the Geraldo show to report he was being falsely arrested. (*Id.* at 80.)

While Galarnyk was in police custody, defendant Mike Martin, a Captain with the MPD, gave a press conference regarding the collapse and security issues at the site on the day of Galarnyk's arrest.  (Aff. of Darla Boggs, Dec. 29, 2010, Ex. 4, Dec. 29, 2010, Docket No. 84.)  At the press conference, after describing an individual who had come to the scene trying to make money by selling equipment, Martin stated that he had met an individual at the scene on the day of the collapse.  He described the meeting as occurring "as we were still running around trying to do our work, trying to get in order, do the things we needed to do, and [he] said that he could help us. . . .  I pointed him to the Mn/DOT employees . . . ." (*Id.*  at 10.)  He stated that later that night he saw the individual on national news programs claiming to have a model of the bridge which did not "sound right" to him.  (*Id.*)  He talked to the NTSB officials the next day and learned that the individual had been on Geraldo criticizing officials involved with the bridge.  (*Id.* at 11.)  Martin announced to the press that an individual had been taken into custody for questioning.  (*Id.*)  He further cautioned that anyone coming to the scene to capitalize on the situation would be discredited such that they "won't have the credibility to sell Girl Scout cookies. . . . [I]f you are . . . the best consultant . . . we will call you if we need you. Don't call us." (*Id.*)  At least two news outlets utilized Martin's statements in their coverage of the bridge collapse.  (*See* Mem. in Opp'n to State, Ex. C (Pioneer Press), Ex. D (WCCO), Docket No. 101.)  WCCO used Galarnyk's name in an article about individuals crossing the perimeter.  (*Id.*, Ex. D ("Police said Timothy Galarnyk posed as a

federal official from Washington, D.C.  Galarnyk got into a roped [area] hoping to help work with heavy equipment.  Now he is in jail.").)  There is no evidence on the record that Martin ever identified Galarnyk by name in his statements to the press.

The Court dismissed a number of Galarnyk's claims on an earlier motion for summary judgment by Fraser and the State Patrol.  (Docket Nos. 36, 43.)  Furthermore, Galarnyk voluntarily dismissed all claims against unknown plaintiffs and the City of Minneapolis in his moving papers, as well as some individual claims against Martin. (Docket Nos. 101, 102.)   The remaining claims addressed by this Order are as follows: constitutional and state illegal stop and false arrest claims against Fraser; First Amendment retaliation against Fraser and Martin; federal and state law conspiracy against Martin.   Fraser and Martin have moved for summary judgment, asserting qualified immunity for the remaining federal claims and official immunity for the remaining state claims.

**ANALYSIS**

## I.      STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in

the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    QUALIFIED AND OFFICIAL IMMUNITY

Frasier and Martin assert qualified immunity in response to the federal claims against them. Qualified immunity is "an **immunity from suit** rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis original); *Janis v. Biesheuvel*, 428 F.3d 795, 800 (8th Cir. 2005). The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [are] resolved prior to discovery . . . ." *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987). Accordingly, "[the Supreme Court] repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). The intent behind a qualified immunity analysis is to balance "the need to hold officers accountable when they exercise power irresponsibly" with "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, ---, 129 S. Ct. 808, 815 (2009).

The Supreme Court adopted a two-part test in *Saucier v. Katz*, 533 U.S. 194 (2001), to determine the applicability of qualified immunity. In analyzing the officers' claim of qualified immunity, this Court considers: (1) whether the facts, when viewed in

the light most favorable to Galarnyk, support a finding that the officers' conduct violated a constitutional right of Galarnyk, and (2) whether that constitutional right was "clearly established" at the time of the incident such that a reasonable officer would have known that his actions were unlawful. *Pearson*, 129 S. Ct. at 815-16; *see also Saucier*, 533 U.S. at 201.[2]  Qualified immunity is appropriate only if no reasonable fact-finder could answer yes to both of these questions. *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).

Fraser and Martin assert official immunity as a defense to the state law claims against them.  In Minnesota, official immunity from state-based claims provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 678 (Minn. 1988) (quoting *Susla v. State,* 247 N.W.2d 907, 912 (1976)).  "Police officers are generally classified as discretionary officers entitled to official immunity." *Maras v. City of Brainerd,* 502 N.W.2d 69, 77 (Minn. Ct. App. 1993) (citing *Johnson v. Morris,* 453 N.W.2d 31, 42 (Minn. 1990)).

In the official immunity context, willful and malicious are synonymous, *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991), and mean "intentionally committing an act that the official has reason to believe is legally prohibited." *Kelly v. City of Minneapolis*,

---

[2] The Court in *Pearson* receded from the *Saucier* requirement that a court determine a constitutional violation first before engaging in a discussion of whether the right was clearly established.  129 S. Ct. at 821.

598 N.W.2d 657, 663 (Minn. 1999) (citing *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994)).   This definition differs from the common law understanding of malice and intent.   "The [malice] exception does not impose liability merely because an official **intentionally** commits an act that a court or a jury subsequently determines is a wrong.   Instead, the exception anticipates liability only when an official intentionally commits an act that he . . . then has reason to believe is [legally] prohibited."  *Rico*, 472 N.W.2d at 107 (emphasis original).

## III.    CLAIMS AGAINST FRASER: FALSE ARREST

### A.    Federal claims

Galarnyk alleges that Fraser illegally stopped and falsely arrested him in violation of his rights under the Constitution.   The Fourth Amendment protects individuals from "unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.   "[A] seizure alone is not sufficient to establish . . . liability.   The seizure must also be unreasonable. . . . Whether the seizure is reasonable is determined by the totality of the circumstances." *Madison v. City of Minneapolis*, No. 02-4257, 2004 WL 1630953, at *5 (D. Minn. July 15, 2004) (internal quotation marks and citations omitted).   The dispositive question in determining if Galarnyk's constitutional rights were violated, therefore, is whether Fraser's actions were reasonable.   Galarnyk asserts that he was seized both when Fraser stopped him, and when Fraser took him to the MPD trailer where he was ultimately arrested.  Each is governed by a separate standard of reasonableness.

### 1.    Investigatory Stop

Galarnyk alleges that Fraser's action in stopping him from leaving in his car, prior to taking him to the MPD trailer, was unreasonable in light of the circumstances and therefore violated his constitutional right to be free from unreasonable investigative stops. An investigative stop need not be supported by probable cause. *Terry v. Ohio*, 392 U.S. 1, 22 (1968).   "While police must have probable cause in order to arrest (or seize) a person, they need only have reasonable suspicion that criminal activity is afoot to stop someone." *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008).   Here, the parties do not dispute that Fraser only stopped Galarnyk after he was alerted to the disturbance Galarnyk had caused in the OSHA trailer.   Since Galarnyk's actions support probable cause, as detailed below, they also support a reasonable suspicion since the latter is a lesser standard. *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002).   Since the Court finds no constitutional violation in Fraser's stop of Galarnyk, it need not determine whether the right was clearly established at the time. *Pearson*, 129 S. Ct. at 815-16.   As a result, Fraser is entitled to qualified immunity on the unreasonable stop claim.

### 2.    Arrest

"In connection to a Fourth Amendment false arrest claim, the relevant inquiry is whether the officers had probable cause to arrest . . . ." *Smithson v. Aldrich*,  235 F.3d 1058, 1062 (8th Cir. 2000).   "It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth . . . Amendment[]." *Hannah v. City of Overland, Mo.*, 795 F.2d 1385, 1389 (8th Cir. 1986).

Galarnyk argues that Fraser did not have probable cause to arrest him. To evaluate whether probable cause existed for a warrantless arrest, the Court considers whether, based on the totality of the circumstances, the facts justified a "reasonably cautious police officer's belief" that the subject has committed or was committing a criminal offense. *Anderson v. Cass Cnty., Mo.*, 367 F.3d 741, 745 (8th Cir. 2004). An arrest is still lawful, even if the arresting officer erroneously believed probable cause existed for the arrest, so long as there was probable cause to arrest the plaintiff for some lawful reason. *See Devenpeck v. Alford*, 543 U.S. 146, 154 (2004). In fact, "the Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, **whatever** the subjective intent." *Whren v. United States*, 517 U.S. 806, 813-14 (1996) (emphasis original) (internal quotation marks omitted) (noting that the actual motivations of the officers are not the "touchstone" of reasonableness).

As a preliminary matter, the facts proffered by Galarnyk indicate that Fraser was not the arresting officer. The MPD arrest report shows that Officer Thomas Schwartz was the arresting officer. (Aff. of Thomas Schwartz, Feb. 7, 2011, Ex. A at 3, Docket No. 107.) Galarnyk admits that Fraser was not the arresting officer. Claims of false arrest against non-arresting officers generally fail. *See, e.g.*, *Sappington v. Bartee*, 195 F.3d 234, 237 (5th Cir. 1999); *Bearnarth v. Montgomery Cnty.*, *Md.*, No. 09-0501, 2011 WL 665325, at *13 (D. Md. Feb. 14, 2011).

Only when a non-arresting officer is attempting to shield himself from liability for the results of reckless or intentionally false statements or omissions by having another officer make the arrest have courts held a non-arresting officer liable for a false arrest.

*Miller v. Prince George's Cnty., Md.*, 475 F.3d 621, 630 (4th Cir. 2007) ("[A] police defendant who acts intentionally or with reckless disregard for the truth may not insulate himself from liability through the objectively reasonable conduct of other officers.") (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 86 (1st Cir. 2005)).  Galarnyk asserts that Fraser had a malicious motive and "caused" his arrest.

However, viewing the record before the Court in a light most favorable to Galarnyk, the Court determines that Fraser had probable cause to effectuate the arrest of Galarnyk, making his purported motive for the arrest immaterial.  Galarnyk admits he was in a secured area without authorization[3] and was disrupting official meetings in the midst of an emergency scene.  Fraser was alerted by OSHA personnel that Galarnyk was being disruptive and was asked to intervene.  This disruption provided Fraser probable cause to justify Galarnyk's warrantless arrest, regardless of his actual motive.  "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . .  [H]is subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."  *Devenpeck*, 543 U.S. at 153.  As a result, the Court finds no constitutional violation in Galarnyk's arrest.

---

[3] Galarnyk argues that he was given access to the cordoned off area and as such he has an affirmative defense to any trespass charge under Minnesota Statute § 609.605(11).  However, an arresting officer need not be correct about the basis for probable cause to make a lawful arrest. *See Devenpeck*, 543 U.S. at 153.  In this case, the Court finds that this potential affirmative defense, that may have later defeated an indictment, does not bear on a determination that probable cause existed at the moment of the arrest.

In sum, the Court finds Fraser entitled to qualified immunity on the federal illegal stop and false arrest claims, both because he was not the arresting officer and because probable cause defeats Galarnyk's assertion that Fraser had a malicious motive.

### B.    State Claims

Minnesota state law also requires probable cause for a warrantless arrest. Minn. Stat. § 629.34 subd. 3. State false arrest claims based on the absence of probable cause incorporate the federal standard for probable cause. *See United States v. Bazinet*, 462 F.2d 982 (1972) ("The legality of an arrest is to be determined according to state law, consistent with constitutional requirements."). State claims of an illegal stop also utilize the federal standard of a reasonable articulable suspicion, a standard that is less than probable cause. *State v. Waddell*, 655 N.W.2d 803, 809 (Minn. 2003). Therefore, a showing of probable cause also defeats state illegal stop and false arrest claims. *See, e.g.*, *Stepnes v. Ritschel*, No. 08-5296, 2011 WL 97983, at *17 (D. Minn. Jan. 12, 2011); *see also Hoppe v. Klapperich*, 28 N.W.2d 780, 792 (Minn. 1947) (noting that malice coupled with an absence of probable cause stripped a prosecutor of official immunity). The Court therefore finds that Fraser is entitled to official immunity on the state law illegal stop and false arrest claim.

## IV.    CLAIMS AGAINST FRASER AND MARTIN: RETALIATION

Fraser and Martin assert they are entitled to qualified immunity on Galarnyk's retaliation claim. A citizen's right to exercise First Amendment freedoms "without facing retaliation from government officials is clearly established." *Kilpatrick v. King*,

499 F.3d 759, 767 (8th Cir. 2007).  To prove First Amendment retaliation, Galarnyk must show 1) he engaged in protected activity, 2) Fraser and/or Martin took adverse actions against him that would chill a person of ordinary firmness from continuing in the activity, and 3) the adverse actions were substantially motivated by the exercise of the protected activity.  *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004); *see also Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007).  On the third prong, Galarnyk must show that the retaliatory motive was a "but-for" cause of the actions: that Galarnyk was "singled out" because of his exercise of constitutional rights.  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010).

### A.      Protected Activity

The First Amendment protects Galarnyk's right to freedom of expression.  U.S. Const. amend. I; *Smith v. Ark. State Highway Emps., Local 1315, et al.*, 441 U.S. 463, 464 (1979) ("The government is prohibited from infringing upon [free speech] guarantees . . . by imposing sanctions for the expression of particular views it opposes.").  Galarnyk's appearances on news programs are thus protected activity and he has satisfied the first prong.

### B.      Adverse Action and "Chilling"

An arrest qualifies as an adverse action for the purposes of a First Amendment retaliation claim.  *Baribeau*, 596 F.3d at 481.  Therefore, assuming Fraser effectuated his arrest, Galarnyk has satisfied this prong as to Fraser.  Galarnyk alleges that Martin's press

conference also constitutes adverse action.[4]   The statements that Galarnyk claims were retaliatory were:

- a Pioneer Press article on August 10 that stated: "Another man, whom Martin would not identify, had duped at least one television network – including a show hosted by Geraldo Rivera – into thinking he was a bridge expert."  (Mem. in Opp'n, Ex. C, Docket No. 101.)

- a WCCO article on August 9 that stated: "Police said Timothy Galarnyk posed as a federal official from Washington, D.C.

---

[4] Galarnyk's complaint does not include a claim for defamation, however the Court finds that if it were read to include such a claim, Martin would be entitled to either absolute or official immunity.  In Minnesota, for a statement to be defamatory, Galarnyk must show that Martin made "(a) a false and defamatory statement about [Galarnyk]; (b) in unprivileged publication to a third party; (c) that harmed [Galarnyk's] reputation in the community."  *Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003).  However, since Martin was MFD's media representative, his statements are protected by absolute immunity.  *Carradine v. State*, 511 N.W.2d 733, 737 (Minn. 1994); *see also Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997) (noting that the primary inquiry in applying absolute immunity is where the public interest served is one of paramount importance such that it should be protected at the expense of compensating harm to a defamed person's reputation).  The press conference regarding the bridge collapse, and in particular regarding the maintenance of security at the collapse site, served just such a paramount public interest sufficient to confer absolute immunity.

Further, by speaking on national talk shows, Galarnyk may have transformed himself into a public figure.  *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 155 (1967) (noting that courts may consider one a public figure who "by his purposeful activity . . . thrust[s] his personality into the 'vortex' of an important public controversy").   Public figures must prove actual malice in a defamation claim in part because they can "command[] sufficient continuing public interest and [have] sufficient access to the means of counterargument to be able to expose through discussion the falsehood and fallacies of the defamatory statements."  *Id.* (internal quotation marks omitted).  As a public figure, Galarnyk cannot prevail on a defamation claim "unless he proves that the statement[s were] made with 'actual malice' – that is, with knowledge that [they were] false or with reckless disregard of whether [they were] false or not."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *Mahnke v. Nw. Publ'ns, Inc.*, 160 N.W.2d 1, 7 (Minn. 1968).  The record does not support a showing of actual malice, given that Martin stated several times that he was not sure who Galarnyk was and that he wanted to talk to him to determine who he was.  For all these reasons, the Court finds that even if the facts alleged are considered a claim of defamation, Martin would be entitled to benefit from either absolute or official immunity on the claim.  Therefore, the Court concludes that a defamation claim would fail against Martin if it had been properly pled.

Galarnyk got into a roped [area] hoping to help work with heavy equipment." (*Id.*, Ex. D.)

- a statement by Martin at the press conference on August 9: "I want to send a clear message to people.  If you come here trying to sell your product or your services and capitalize on the people here, I'll make sure, within every legal means possible, that you won't have the credibility to sell Girl Scout cookies."  (Boggs Aff., Ex. 7 at 11, Docket No. 84.)

"The Fifth Circuit has . . . held that in the normal case, criticisms, accusations, and investigations are not punitive, and do not rise to the level of actionable retaliation." *Linzy v. Cedar Hill Indep. Sch. Dist.*, No. 01-11145, 2002 WL 1021883, at *1 (5th Cir. May 9, 2002) (citing *Colson v. Grohman*, 174 F.3d 498, 511, 512 n.7 (5th Cir. 1999)). While "[i]n some cases embarrassment, humiliation and emotional distress may be sufficient to support a . . . claim[,]" *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002), generally courts require more than statements that purport to "affect[] the characters and reputations of Plaintiffs, holding them up to ridicule, contempt, shame, and disgrace, making them the objects of reproach, intentionally degrading Plaintiffs and abridging their respectabilities, comforts, and positions in society . . . ." *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999) (finding no adverse action in the case of a politician who had openly criticized the fire department which then created a video to discredit her, allegedly causing her to lose an election).  Thus it is possible that Martin's statements do not even constitute adverse actions.

Furthermore, the remainder of the analysis on this prong is whether "a person of ordinary firmness" would be chilled.  *Zutz v. Nelson*, 601 F.3d 842, 848-49 (8th Cir. 2010) (quoting *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007)).  "[I]t would trivialize the

First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise.'" *Nuacke*, 284 F.3d at 928 (quoting *Bloch v. Ribar*, 156 F.3d 673, 679 (6th Cir. 1998)).   The chilling effect of an adverse action must be determined on an objective basis.  *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) ("The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done.").

In *Nuacke*, the Eighth Circuit held that a person of ordinary firmness would not be deterred by "offensive, unprofessional and inappropriate" comments that included a public scolding at City Council meetings by City Council members and public name calling.   284 F.3d at 927-28.   The Eighth Circuit also held in *Zutz* that a person of ordinary firmness would not be deterred by false allegations of illegal activities at a public board meeting, a false report filed with the County Attorney, widespread circulation of the report after the County Attorney had declined to investigate, and a letter sent to multiple people including a newspaper falsely alleging illegal and improper acts. 601 F.3d at 846.

The public accusations in both *Nuacke* and *Zutz* were more serious than the statements Martin made about Galarnyk, whom he did not even identify by name. "Because public debate is 'rough and tumble,' plaintiffs 'are expected to cure most misperceptions about themselves through their own speech and debate.'"   *Valdez v. New Mexico*, 109 Fed. App'x. 257, 263 (10th Cir. 2004) (quoting *Eaton v. Meneley*, 379 F.3d 949, 953 (10th Cir. 2004)).   Similarly, Galarnyk could have cured misperceptions

and by his own admission appeared to attempt such a cure by calling Geraldo immediately upon his arrest.  The Court finds that even if Martin's statements constituted adverse action, by the standards of the Eighth Circuit, a person of ordinary firmness would not have been "chilled" to exercise his First Amendment rights.  As a result, Galarnyk's claim against Martin for First Amendment retaliation fails on this second prong of the analysis.

### C.      Motivation

The retaliation claim against Fraser fails on the third prong – whether the adverse action was substantially motivated by the exercise of the protected activity.  *Revels*, 382 F.3d at 876.  Galarnyk's arrest was supported by probable cause.  In the context of a chain of government officials arresting an individual for an improper motive held by one but not by the actual actor, "some evidence must link the allegedly retaliatory official to [the official] whose action has injured the plaintiff.  The connection, to be alleged and shown, is the absence of probable cause."  *Hartman v. Moore*, 547 U.S. 250, 263 (2006) (addressing alleged prosecutorial misconduct).  Therefore, "challenges to the disposition of specific arrest-related claims [e.g. retaliation claims] . . . will be rendered moot if the arrests were supported by probable cause."  *McCabe v. Parker*, 608 F.3d 1068, 1075 (8th Cir. 2010).  Since, as detailed above and based on Galarnyk's version of the facts, probable cause existed to arrest Galarnyk, any purported retaliatory motive by Fraser was not the "but for" cause of the arrest, regardless of whether Fraser is considered the arresting officer or caused Galarnyk's arrest.  *See Baribeau*, 596 F.3d at 481.

Regarding Martin's statements to the press, Galarnyk has not proffered sufficient evidence that the substantial motivation of the statements was to retaliate against him. Martin's statements were directed at maintaining scene security by discouraging unauthorized persons from coming to the scene. There is no evidence, moreover, that Martin specifically identified Galarnyk by name in any public statement.

Had Martin been responding to personal criticism, the exercise of his authority to speak to the press could be called into question. *See, e.g.*, *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity."); *Bloch*, 156 F.3d at 681-82 (plaintiffs told to stop publically criticizing a police officer or "risk being used for 'political purposes'"); *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (regarding statements by a judge after being personally and publically criticized). Here, there is no evidence that Martin's statements were substantially motivated by a desire to retaliate sufficient to deny him qualified immunity.

In sum, Galarnyk's claim of retaliation for exercise of his First Amendment rights fails as to Fraser for probable cause, as to Martin since the statements would not chill a person of ordinary firmness, and as to both for failure to demonstrate sufficient retaliatory motivation. As a result, both Fraser and Martin are entitled to qualified immunity on the First Amendment retaliation claim for lack of a constitutional violation.

## V.      CLAIMS AGAINST MARTIN: CONSPIRACY

Galarnyk alleges that Martin conspired with others to violate Galarnyk's constitutional rights.  In particular, Galarnyk alleges that Martin was the mastermind behind a plot to retaliate against him for exercising his First Amendment rights.  In order to prevail on a federal civil conspiracy claim, Galarnyk must show "that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). The claim requires proof of an actual deprivation of a constitutional right or privilege.  *Id.*  Here, Galarnyk's conspiracy allegations rest on his claims of retaliation of his exercise of his First Amendment rights.  As detailed above, this claim does not survive summary judgment and therefore the conspiracy claim also fails.

As to his state law civil conspiracy claim, under Minnesota law there is no civil action for conspiracy.  *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) (citing *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950)).  Rather, "[a] civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability, and hence such a 'claim' is dependent upon a valid underlying tort claim." *Carlson v. A.L.S. Enters., Inc.*, No. 07-3970, 2008 WL 185710, at *5 (D. Minn. Jan. 18, 2008) (internal quotation marks omitted).  Since Galarnyk alleges no viable state law tort against Martin, nor do his constitutional claims survive, the state conspiracy claim fails as well.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants Mike Martin, City of Minneapolis, and Unknown Police Officers' motion for summary judgment [Docket No. 78] is **GRANTED**.

2.     Defendants Tom Fraser, Unknown State Patrol/Troopers, and Unknown Supervisor of Captain Tom Fraser's motion for summary judgment [Docket No 80] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 22, 2011                          ___s/ John R. Tunheim___
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                      United States District Judge